## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jun 13 2018, 9:35 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Luisa M. White
Lafayette, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Abigail R. Recker
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Termination of the Parent-Child Relationship of P.P., K.P., and B.P., Minor Children, | June 13, 2018 |
| | Court of Appeals Case No. 79A02-1711-JT-2834 |
| J.J., Mother, | |
| *Appellant-Respondent*, | Appeal from the Tippecanoe Superior Court |
| v. | The Honorable Faith A. Graham, Judge |
| The Indiana Department of Child Services, | Trial Court Cause Nos. 79D03-1704-JT-38 79D03-1704-JT-39 79D03-1704-JT-40 |
| *Appellee-Petitioner*. | |

**Brown, Judge.**

[1] J.J. ("Mother") appeals the involuntary termination of her parental rights with respect to P.P., K.P., and B.P. (the "Children").[1] Mother raises three issues which we consolidate and restate as whether the trial court erred in terminating her parental rights. We affirm.

### Facts and Procedural History

[2] On November 18, 2015, the Indiana Department of Child Services ("DCS") filed a verified petition alleging K.P., born on June 14, 2012, P.P., born on January 26, 2014, and B.P., born on March 5, 2015, were children in need of services ("CHINS"), that Mother and the Children's father ("Father") have a history of substance abuse and regularly use marijuana while caring for them, and that DCS removed K.P. and P.P. from the care of Mother and Father in May 2014 after K.P. tested positive for THC and Mother tested positive for methamphetamine. On December 14, 2015, the trial court held a fact-finding hearing on the petition, and on December 23, 2015, the court adjudicated the Children to be CHINS.

[3] On February 3, 2016, the court entered its CHINS disposition order and a parental participation decree. The disposition order allowed the Children to remain in the care of Mother and Father. The parental participation decree ordered Mother to participate in "intensive case management with HGCF and follow recommendations," "a substance abuse assessment and follow

---

[1] The court also terminated the parental rights of the Children's father as to the Children, and the Children's father does not appeal the termination.

recommendations," and "in drug screens as requested by DCS, [the Court Appointed Special Advocate ("CASA")] and service providers," and to "[n]ot consume or possess alcohol" and "[n]ot consume or possess, nor allow anyone else in your home to consume or possess, any legend drug or controlled substance without a prescription." DCS Exhibit 5 at 11-12.

[4] On March 1, 2016, the court entered an Order on Modification of Dispositional Decree, which found that Mother and Father did not follow the court's orders and continued to consume and possess alcohol. The order required Mother and Father to "remove all products containing alcohol from the home today's date [sic]" and stated that it "orders immediate removal of the children" should they "fail to follow the Court's Orders, continue to possess or consume products containing alcohol, fail to allow providers, DCS and CASA access to the home and to the children or allow the children to be in the care of unapproved persons." *Id.* at 16-17. On March 29, 2016, on motion of DCS the court issued an order for rule to show cause which found Mother in contempt and ordered her to serve a sentence, suspended upon compliance with court orders.[2]

---

[2] Specifically, in its March 29, 2016 order for rule to show cause, the court found Mother to be in contempt for failure to allow CASA into her home on one date and consuming alcohol on four other dates. The court then ordered: "[Mother] to purge herself of said contempt by serving a sentence of incarceration; suspended upon her 100% compliance with this Court's orders." DCS Exhibit 5 at 18. We have observed that a jail sentence for civil contempt must be coercive or remedial rather than punitive in nature. *Stanke v. Swickard*, 43 N.E.3d 245, 249 (Ind. Ct. App. 2015) (citation omitted). While not challenged on appeal, we find this order both punitive and an innapropriate exercise of authority. The court had already imposed the sanction of "immediate removal of the children" in the event of failure to comply with its orders. DCS Exhibit 5 at 17.

[5]     On April 8, 2016, the Children were removed from the care of Mother.[3]  In its April 11, 2016 Order on Modification of Dispositional Decree, the court accepted the recommendation of DCS to modify placement for B.P. and P.P. to the care of the maternal great aunt and uncle and for K.P. to the care of the paternal cousin, and found in part:

> On February 29, 2016 and again on March 28, 2016, the Court ADMONISHED [Mother] and [Father] for NOT putting [the Children] as a priority in this proceeding, for NOT following the Court's orders and for continuing to consume and possess alcohol.  Since that time there [have] been continued missed drug screens and failure to complete the substance abuse assessment.
>
> DCS received a report on 4/27/2016 [sic] alleging [the Children] had been provided/had access to alcohol, cigarettes, and [] inappropriate sexual contact between Mother's oldest child [("A.W.")] . . . and a younger half-sibling.  [K.P.] reported [P.P.] drank from a bottle that was sitting on the table in [Mother's] room and was unable to stand up.  [A.W.] age 7, Mother's child from a previous relationship, was able to describe the bottle of Fireball [whiskey] and reported [K.P.] and [P.P.] both drank from the bottle and that [Mother] was aware that [A.W.] had tried a cigarette.

*Id.* at 22.

---

[3] Entries for April 8, 2016, in the chronological case summaries for the CHINS cases indicate that the trial court set a Modification Hearing for April 11, 2016, and state that the court found "the least restrictive placement for [the Children] is placement in the care of their maternal great aunt and maternal great uncle pending the hearing," and that the Children "should be removed from the home because continuation in the home would not be in the best interest of [the Children] and contrary to the welfare of [the Children]."  DCS Exhibit 1 at 11; DCS Exhibit 2 at 10-11; DCS Exhibit 3 at 11.

[6] On April 14, 2016, DCS filed a Progress Report which stated in part that it had referred Mother on January 12, 2016, to a substance abuse assessment at Wabash Valley Alliance in Tippecanoe County; that several weeks after the January 12, 2016 referral, Mother said she preferred to complete the substance abuse assessment at the Carroll County Wabash branch and family case manager Tracy Williams ("FCM Williams") referred her accordingly; that Mother contacted FCM Williams in March of 2016 to ask if she could have the assessment billed to DCS because she had a deductible with her Medicaid plan; and that, after FCM Williams contacted both the business office at the Carroll County Wabash branch and the DCS Medicaid unit and provided the information to Mother, Mother refused to complete a substance abuse assessment.[4]

[7] On April 4, 2017, DCS filed a verified petition for the involuntary termination of the parent-child relationship of Mother and Father as to the Children. On June 28, 2017, the court held a hearing on the petition at which Mother failed to appear.[5] Jenny Cahoon, a home-based service provider for Home-Based Goal-Focused Services for Children & Families ("HGCF") who served as a

---

[4] The Progress Report also indicated that the allegations which were reported to the DCS hotline the morning of April 7, 2016, and which resulted in the removal of the Children included that P.P. "drank [F]ireball alcohol and was not able to get up after drinking it while in [Mother's] care" and Father found P.P. in this condition, that A.W. "touched his half-sister innappropriately; he licked the half-sister's vagina and told a relative to do it, too, about 5-6 months ago," and that Mother texted A.W.'s father to see if A.W. was allowed to drink a beer, allowed A.W. to stay in the care of a known drug felon and in the care of "a 14-16 year old special needs child whom she had only know[n] for a week," and had sex with Father in front of A.W., who slept in their room next to their bed. DCS Exhibit 6 at 20.

[5] Mother was apprised of the termination hearing by the CASA.

"support mechanism" for Mother and Father, testified during the hearing. Transcript Volume 2 at 10. DCS Exhibit 9, which was admitted at the hearing, contains the January 2016 Initial Treatment Plan signed by Cahoon that states under the heading "DCS Service Goals":

> Help [Mother and Father] develop coping skills so that they do not use drugs.
>
> **Parents say they have not used marijuana since January 1st. FCM informed this worker that [Mother] had tested positive to alcohol. This worker told [Mother] about the positive alcohol screen and she said she does drink "Fireball[]" [whiskey] nightly. . . . This worker told [Mother] that FCM said there is a court order that says [she and Father] can't consume alcohol. [Mother] sent this worker a text stating, "I'm not worried about the alcohol. I'm 25 and I'm not on probation. CPS's problem is what's illegal. And that's week [sic]. So I'm not stopping drinking when I want to drink." [Mother] wants to know who level [sic] for the marijuana screen because it should continue to go down.**

DCS Exhibit 9 at 2-3. Cahoon testified she started having concerns with the family shortly after she started working with them and she was conducting "EtG's," or tests for alcohol use, and that both Mother and Father's tests "were coming back positive but [Mother's] were coming back over 10,000 which shows kind of a chronic pattern of drinking every night." Transcript Volume 2 at 11. She indicated that, in response to Mother's admission that she drank every night, she "went over the Parental Participation Decree and that in Tippecanoe County you cannot drink." *Id.* at 12. She stated Mother was "just oppositional and defiant" "[a]ll of the time" and would threaten to hurt people

on a regular basis. *Id.* When asked to further explain, she testified about an incident where Mother said she better "get the police here because [Mother] was going to kick [FCM Williams's] a--" and that "even with two (2) police officers there, [Mother] was still having a hard time containing herself." *Id.* at 13.

[8] Cahoon indicated that Mother would not obtain a job or travel on the bus, that she thought Mother never used her for transportation despite that being "part of [her] services," and that she did not believe that Mother and Father did all that they could to help themselves to be successful in reunification with the Children. *Id.* at 12, 14-15. When asked to explain her belief, she stated:

> There are a multitude of reasons. We tried to process things throughout the case about drinking, about going for drug screens, I mean especially [Mother] was not going to do things if she didn't want to do them. She wasn't going to get up for appointments. She wasn't going to go for drug screens. . . . It was just always a "No". She was not going to do it. . . . She would half the time not answer the door. Or she would say they didn't come. Just really hostile. We had several visitation facilitators in and out of there.

*Id.* at 15. Cahoon testified that Mother was "supposed to do Character Restoration and comply with the drug screens and obtain employment," and that "none of those things were ever done well. I mean she started but then she

stopped."[6] *Id.* at 20-21. She testified that, from what she was able to observe, Mother was not a good mother because "she would fail to protect her children." *Id.* at 22.

[9] Shane Serber, a home-based case manager and visit facilitator from Arising's Incorporated who supervised visits from the middle of October 2016 to approximately the second week of December 2016, testified that the family was discharged from services in accordance with the company's late cancellations and no-show policy because there were "several late cancellations and at least three (3) no shows." *Id.* at 26. He testified he had occasion to observe Mother with the Children and that Mother "was much more disengaged during the visit" and that "there were a couple of occasions where [Mother] spent the majority of the visit upstairs in the bedroom not even coming down for 90% of the visit." *Id.* at 28.

[10] Taylor Fristoe, an HGCF employee who conducted drop-in visitations with the family, testified that she thought Mother was the driving force in a lot of the family's issues. *Id.* at 53. When asked about the ultimate basis for the discharge of Mother from services, she stated:

---

[6] Cahoon further clarified by stating that she thought Mother only attended "a couple of Character Restorations," and that, when Mother was ordered to return and she let Mother know that the "Character Restoration had started back up," Mother "said that she wasn't going to do it." Transcript Volume 2 at 21. An ISS Monthy Report from July 2016 indicates that Mother stopped going to Character Restoration because "she missed the maximum amount allowed and has to start over. [Mother] does not feel that she needs this class." DCS Exhibit 9 at 61.

Both parents, but [Mother] especially, were very resistant to me coming in. They were very hostile when I was in there. [Mother] called me a b---- on several occasions, directly and indirectly. When [Father] was the only one (1) in the home, he worked very well with me. He was really compliant and cooperative and talkative. . . . If [Mother] was there, [Father] would not speak to me at all. He would not – he would go along with what [Mother] would say. He like spoke to me at the beginning of one (1) of the drop-ins, [Mother] said, "Why are you even talking to that b----?" And so, then he stopped talking to me for the rest of the time I was doing drop-ins. So just with [Mother's] hostility, I just wasn't comfortable doing the drop-ins any longer because it wasn't effective.

*Id.* at 52. DCS Exhibit 8, which was admitted at the hearing, contains a February 23, 2016 Alert Form for HGCF Services signed by Fristoe which indicated that Fristoe traveled twice on February 17, 2016, to the house for drop-in visitations and once for case management and reported that no one was home. A February 23, 2016 Alert Form also states that Fristoe arrived on February 22, 2016, at the house for a drop-in visitation, "observed the gray van in the parking lot," "could head [sic] the television on but not [sic] one answered the door," knocked three times and left, and a March 1, 2016 Alert Form indicated Fristoe arrived at the house on that day for a random drop-in visitation and knocked three times but no one answered the door. DCS Exhibit 8 at 2. A March 30, 2016 Record of Contacts Intervention Report indicates that Fristoe arrived at the house for a random drop-in visitation, that the whole family was present and Mother was on the phone, that Mother declared drop-in visitations were not to be every day and she wished to know why FCM

Williams increased them and suggested "just to be a b----," that Mother stated "the b---- is here for the walk through" to the person on the phone, that Fristoe asked permission to walk through the house and Mother agreed only because "they will get in trouble if they don't let me," and that Mother refused to allow Fristoe upstairs because one of the Children was sleeping. *Id.* at 4.

[11] DCS family case manager Ambyr Wade ("FCM Wade") testified she had been working with the family since July of 2016, that she recommended termination of parental rights, and that it was in the Children's best interest that the rights of Mother and Father be terminated and that they be adopted by their current placements. When asked about the basis of her opinion as to the best interests of the Children, she responded:

> The parents had services for quite some time, both in this CHINS case and the previous CHINS case. They have a significant history of substance use. They have a significant history of domestic violence. Specifically, in this case we have seen the behaviors of [Mother] threatening providers. [Father] and [Mother] had gotten in physical altercations. We heard testimony today about some of those specific incidents. It is just a continual repetitive [sic] and [the Children] are in the middle. It is not in their best interest. It does not provide safety. It doesn't provide stability. It doesn't provide permanency and [the Children] need that. They need consistent structure. They need a nurturing environment and the parents don't supply that.

Transcript Volume 2 at 59-60. FCM Wade also indicated that the petition for involuntary termination had to do with an incident involving law enforcement being called because Mother was threatening to punch the previous case

manager in the cancer port in her chest. She answered affirmatively during cross-examination when asked by Mother's counsel "[w]hen [Mother] indicated that she was going to do all of the services, you did make all of the referrals and recommendations and gave her all the information." *Id.* at 66. She described a visit conducted at the Bauer House involving Mother that "took a quick turn" when Mother "couldn't recover from her aggressive, verbal behaviors," and testified that:

> [Mother] was putting [the Children] in the car to be transported back to the great grandmother's house. And the provider – they had just eaten during the visit and the provider did not allow juice bottles or milk bottles in the car during transport which was maybe a five (5) to seven (7) minute transport across town. And [Mother] was furious. She was aggravated, and she just went off. And she wasn't going to do her visits anymore and she actually refused to go to anymore visits with this provider. It wasn't harmful to the child, it wasn't going to hurt the child and she just didn't like that somebody told her she couldn't do something. And it was all in front of [the Children].

*Id.* at 67-68. FCM Wade testified that Mother "participated in intakes which are like clinical assessments on May 3, 2016 and again in September of 2016." *Id.* at 64. DCS Exhibit 27 includes a Wabash Valley Alliance report signed by Monica Erk and dated May 3, 2016, and another signed by Deep Battu and dated September 20, 2016.[7] A letter from Battu dated December 1, 2016, states

---

[7] The May 3, 2016 report indicates that Mother was not open to discussing herself during the intake and "seemed angry" that she had to go through it, that Mother "made it clear" that she did not want services of any kind because "she feels that DCS has her going through too many hoops as it is," that Mother's drug

that Mother did not attend any scheduled appointments during the reporting period and that Wabash Valley Alliance would be "discharging and closing her [sic] as she has not been seen since September 20, 2016." DCS Exhibit 27 at 23. When asked why she did not place a referral for another psychosocial evaluation, she explained that Mother needed to participate in the clinical evaluation again for the provider to complete the psychological evaluation and the "testimony or in the report written on the psych evaluation is, '[Mother] didn't want to participate in that and through this entire case she has not participated in services," and indicated that Mother's "compliance would not be there" and that Mother "hasn't participated in anything consistently since that time." Transcript Volume 2 at 65. She also testified that she did not believe another psychological evaluation would have assisted Mother and Father in the case.

[12] CASA Tammy Lindblom testified at the hearing that she had worked with the Children since February 2016, she believed that parental rights should be terminated and supported DCS's plan for adoption, she had been on the case since the beginning and had not observed any consistency from either parent,

---

levels have consistently decreased and, as a result, the therapist "recommended IOP but stated that she wouldn't make it a requirement" because Mother's marijuana levels "had gone down," and that Mother stated she did not want to attend IOP. DCS Exhibit 27 at 3. Later, in the Recommendations section, the report states that Mother "made it very clear that she did not want to attend IOP." *Id.* at 13. The September 20, 2016 report indicates that Mother reported no mental health symptoms and "continues to meet criteria for cannabis abuse and results from her substance evaluation, combined with psychological testing and personal history will be considered," and that "[d]rug screens from April to current will be requested from DCS." *Id.* at 27. Under the clinical findings section, the report states that Mother would benefit from attending individual therapy to address some possible depressive symptoms and being a victim of domestic violence and that she "appears to be resistance [sic] to all types of intervention and treatment." *Id.*

that she was able to begin a relationship with Mother "until [she] disagreed with or made suggestions to [Father] or [Mother] [and] then there was conflict," and that Mother "pretty much from that point refused to talk to [her] after [the Children] were removed." *Id.* at 74. She also stated:

> When visitations were provided I know the testimony today was from one (1) service provider, but there was four (4) service providers previously that also discharged them from visitation for repeated cancellations, no shows or aggression by [Mother] or within that visit – still you know again even the visitation part, the parents being able to visit, [Father] and [Mother] visiting the children did not even provide any consistency for the children.

*Id.* She answered affirmatively when asked if she thought it would be detrimental to the well-being of the Children if the visits were to resume and stated, when asked about the impact on the well-being of the Children if the court did not terminate the parental rights and instead allowed the continued relationship, that:

> I think it would be very confusing at this point to [the Children]. I believe that [K.P.] – even [K.P.'s] therapist agrees that if there were any visitation it would be critical that there would be someone there to support her in that process. I visited the home where the girls are now placed and what I see even in [B.P.] who is the two (2) year old, I see a very strong difference in [the Children]. They seem – you can tell that they appear very stable. They are well cared for and I believe that it would be harmful for them not to have that stability that they are receiving right now.

*Id.* at 75. She stated during cross-examination that "my interactions with [Mother] and [the Children], she was just kind of there" and that "I really did

not observe her hug or hold all three (3) of [the Children]." *Id.* at 79. CASA Lindblom also indicated that "there were a lot of service providers that have discharged services and yes, DCS workers" and that there have been three DCS family case managers over the course of the case. *Id.* at 83. She agreed that the services provided to Mother and Father were appropriate and stated "no" when asked if she would say that they took advantage of those services and if there were any other services she thought would be beneficial. *Id.* at 87. She testified that it was her belief that Mother and Father were unfit as parents. *Id.* When asked what she would have liked to have seen from Mother and Father, she responded:

> I would have like to have seen some consistency, some consistency in attending services. There just always seems to be excuses about why they could not do things. The biggest thing is I felt like they never – there was never an instance of where they put the children first. It was all about what they could and couldn't do or couldn't get to. . . . When they were able to have time with their children, the majority I would say eighty percent (80%) of the time with the service providers that were willing to make exceptions, they did not attend, or they did not show.

*Id.* at 88-89.

[13] Among others, DCS Exhibits 7, 11, 12, and 14 were admitted at the hearing. DCS Exhibit 7 included a full psychological evaluation with Dr. Jeff Vanderwater-Piercy conducted in 2014. The Monthly Progress Reports and Case Notes from Counseling Partners LLC spanning from April 20, 2016, until August 2, 2016, when the supervisor became "unable to continue providing

services," contain observations of Mother including her becoming upset at a child family team meeting, yelling at the team, standing and hitting Father in the back and then driving away, notwithstanding her absence of a valid driver's license; her yelling at A.W. and stating "[y]ou're not involved in a CPS case so I will bust your a--"; and her grabbing K.P., spanking her bottom, placing her in the corner, and stating "report that to CPS," in response to K.P. telling Mother "you should have asked her to 'please put it down' instead of 'put that f------ phone down'" and hitting Mother's cast on her foot. DCS Exhibit 14 at 23, 29. The Visitation Reports and Monthly Progress Reports from Bauer Family Resources, spanning from August to September 2016, indicate that Mother and Father were discharged from services due to a lack of engagement, "no showed or cancelled three visits in September on 9/1, 9/6, and 9/8," and "were asked to confirm their visitations before they occurred and two visits were not confirmed and cancelled." DCS Exhibit 11 at 5.

[14] On October 31, 2017, the court granted the petition to terminate Mother's parental rights. The order contained detailed findings which addressed Mother's drug use, criminal history, participation in services, and hostile behaviors. Specifically, the order found:

> 4. Neglect (Environmental/Life Health Endangerment) was substantiated against Mother and Father in May 2014 after [K.P.] tested positive for marijuana. Mother tested positive for methamphetamine. The parents admitted domestic violence and Mother was observed with bruising on her arms. A CHINS case was opened in White County that closed in July 2015 with reunification of the family.

5.  A report of neglect by Mother and Father related to a domestic violence incident in front of [the Children] was unsubstantiated in July 2014.

6.  DCS received another report of neglect by Mother and Father on October 1, 2015.  During the investigation, both parents tested positive for marijuana.  Both parents admitted smoking marijuana regularly but denied an addiction. Both parents admitted using marijuana when [the Children] are in the home and when the parents are responsible for supervising [the Children].  The conditions of the home were described as cluttered with floors covered in dirt and other items.

* * * * *

9. . . .  Both parents exhibited threatening behaviors and profanity toward DCS in the presence of [the Children] and made comments about leaving so providers and DCS could not locate [the Children].

* * * * *

13.  Mother denies an ongoing history of substance abuse issues despite extensive collateral evidence otherwise.  Even Father acknowledges Mother's use of synthetic cannabinoids and misuse of prescription medication.  Mother has demonstrated a chronic pattern of alcohol use even during the CHINS case.

14.  During the CHINS proceedings, Mother tested positive for marijuana (01/07/2016), marijuana/alcohol (01/21/2016), marijuana/alcohol (01/28/2016), marijuana/alcohol (02/04/2016), marijuana/alcohol (02/12/2016), marijuana/alcohol (02/12/2016), marijuana/alcohol (02/22/2016), marijuana/alcohol (03/01/2016), marijuana (03/03/2016), marijuana/benzodiazepines–alprazolam (04/06/2016), benzodiazepines–alprazolam (04/19/2016), benzodiazepines–alprazolam (04/20/2016), benzodiazepines–alprazolam (06/13/2016), and benzodiazepines–alprazolam

(06/22/2016). Mother failed to submit to multiple drug screens as requested.

15. Mother's criminal history includes both substance use and domestic violence. Mother was convicted of Receiving Stolen Auto Parts (Class D Felony) and Resisting Law Enforcement (Class D Felony) in July 2010. Mother was convicted of Criminal Mischief (Class A Misdemeanor) in June 2011. Mother was convicted of Conversion (Class A Misdemeanor) in January 2012. Mother was convicted of Domestic Battery (Class A Misdemeanor) in November 2014. Mother was convicted of Battery (Class A Misdemeanor) in November 2014. Mother was charged with Possession of Synthetic Drug or Lookalike Substance (Class A Misdemeanor) in April 2017. Mother was charged With Possession of Synthetic Drug or Lookalike Substance (Class A Misdemeanor) and Visiting a Common Nuisance (Class B Misdemeanor) on May 3, 2017. Mother was charged With Possession of Synthetic Drug or Lookalike Substance (Class A Misdemeanor) and Possession of Paraphernalia (Class C Misdemeanor) on May 25, 2017. All charges pending in 2017 remained pending at the time of the termination hearing.

16. Mother completed a psychological evaluation revealing below average to well below average intellectual functioning. However, test results indicated no cognitive deficits that would limit Mother's ability to benefit from services. Mother failed to complete other evaluations as recommended.

17. Mother failed to consistently participate in any service. Mother was disengaged from [the Children] and hostile toward service providers during scheduled parenting time. . . . Mother has had no contact with [the Children] since December 2016.

18. Mother and Father when [sic] Mother was twelve (12) years of age. Mother and Father married in June 2014. The parents demonstrated a pattern of domestic violence, separation, and reconciliation. During the CHINS case, the parents separated

and reconciled several times. Although Father reports a plan to file for divorce, [he] travelled to provide Mother with cigarettes and soda just two (2) days prior to the termination proceeding. Father has always been submissive to Mother's hostile behaviors and has failed to demonstrate an ability to protect the children from Mother.

19. At the onset of the CHINS case, Father resided with Mother in Lafayette despite a no trespass warning at Mother's Section 8 apartment. Mother has been evicted from her apartment and is reportedly homeless. . . . Paternal Grandfather has a history of child molest[ation] and Mother has expressed a willingness to allow him access to [the Children].

* * * * *

24. . . . Since removal from the care of the parents, [the Children] have thrived in stable environments demonstrating improved behaviors and contentment. [The Children] are bonded with their respective relative placements and have no special needs. [The Children] are adoptable even if the current relative placements are unable to adopt for any reason.

25. Although Mother and Father may love [the Children], neither has demonstrated the ability and/or willingness to meet [the Children's] needs for safety, stability, and permanency. The long-standing history of domestic violence, substance use, and criminal activity displayed by the parents continues today. All imaginable services have been offered and nothing is singularly different in today's circumstances since the time of removal. To continue the parent-child relationships would be detrimental to [the Children]. [The Children] need permanency now.

Appellant's Appendix Volume 2 at 20-23. The order found it was in the best interests of the Children that the parental rights of Mother and Father be terminated and concluded that continuation of the parent-child relationships

poses a threat to the well-being of the Children, that the Children need stability in life and parents with whom they can form a permanent and lasting bond to provide for their emotional, psychological, and physical well-being, and that a reasonable probability existed that the conditions that resulted in removal of the Children from the care of Mother and Father or the reasons for continued placement outside the home would not be remedied since "[n]either parent has demonstrated the ability or willingness to make lasting changes from past behaviors" and "there is no reasonable probability that either parent will be able to maintain stability to care and provide adequately for the children." *Id.* at 23.

## *Discussion*

[15] The issue is whether the trial court erred in terminating Mother's parental rights. In order to terminate a parent-child relationship, DCS is required to allege and prove, among other things:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2).[8] If the court finds that the allegations in a petition described in Ind. Code § 31-35-2-4 are true, the court shall terminate the parent-child relationship. *See* Ind. Code § 31-35-2-8(a).

[16] The State's burden of proof for establishing the allegations in termination cases "is one of 'clear and convincing evidence.'" *In re G.Y.*, 904 N.E.2d 1257, 1260-1261 (Ind. 2009) (quoting Ind. Code § 31-37-14-2), *reh'g denied*. This is "a 'heightened burden of proof' reflecting termination's 'serious social consequences.'" *In re E.M.*, 4 N.E.3d 636, 642 (Ind. 2014) (quoting *In re G.Y.*, 904 N.E.2d at 1260-1261, 1260 n.1). "But weighing the evidence under that heightened standard is the trial court's prerogative—in contrast to our well-settled, highly deferential standard of review." *Id.* We do not reweigh the evidence or determine the credibility of witnesses, but consider only the evidence that supports the judgment and the reasonable inferences to be drawn from the evidence. *Id.* We confine our review to two steps: whether the evidence clearly and convincingly supports the findings, and then whether the findings clearly and convincingly support the judgment. *Id.*

[17] Reviewing whether the evidence clearly and convincingly supports the findings, or the findings clearly and convincingly support the judgment, is not a license to

---

[8] Subsequently amended by Pub. L. No. 42-2017, § 2 (eff. July 1, 2017).

reweigh the evidence. *Id.* "[W]e do not independently determine whether that heightened standard is met, as we would under the 'constitutional harmless error standard,' which require*s the reviewing court itself* to 'be sufficiently confident to declare the error harmless beyond a reasonable doubt.'" *Id.* (quoting *Harden v. State*, 576 N.E.2d 590, 593 (Ind. 1991) (citing *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824 (1967))). "Our review must 'give "due regard" to the trial court's opportunity to judge the credibility of the witnesses firsthand,' and 'not set aside [its] findings or judgment unless clearly erroneous.'" *Id.* (quoting *K.T.K. v. Ind. Dep't of Child Servs., Dearborn Cty. Office*, 989 N.E.2d 1225, 1229 (Ind. 2013) (citing Ind. Trial Rule 52(A))). "Because a case that seems close on a 'dry record' may have been much more clear-cut in person, we must be careful not to substitute our judgment for the trial court when reviewing the sufficiency of the evidence." *Id.* at 640.

A. *Remedy of Conditions*

[18] We note that the involuntary termination statute is written in the disjunctive and requires proof of only one of the circumstances listed in Ind. Code § 31-35-2-4(b)(2)(B). Because we find it to be dispositive under the facts of this case, we limit our review to whether DCS established that there was a reasonable probability that the conditions resulting in the removal or reasons for placement of the Children outside the home will not be remedied. *See* Ind. Code § 31-35-2-4(b)(2)(B)(i).

[19] In determining whether the conditions that resulted in the Children's removal will not be remedied, we engage in a two-step analysis. *In re E.M.*, 4 N.E.3d at 642-643. First, we identify the conditions that led to removal, and second, we determine whether there is a reasonable probability that those conditions will not be remedied. *Id.* at 643. In the second step, the trial court must judge a parent's fitness as of the time of the termination proceeding, taking into consideration evidence of changed conditions, balancing a parent's recent improvements against habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id.* We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination. *Id.* Requiring trial courts to give due regard to changed conditions does not preclude them from finding that a parent's past behavior is the best predictor of future behavior. *Id.* A trial court need not wait until a child is irreversibly influenced by a deficient lifestyle such that his or her physical, mental, and social growth are permanently impaired before terminating the parent-child relationship. *In re Z.C.*, 13 N.E.3d 464, 469 (Ind. Ct. App. 2014), *trans. denied*.

[20] Mother argues that DCS did not prove by clear and convincing evidence there is a reasonable probability that the circumstances that resulted in the Children's removal would not be remedied and that the trial court's findings of fact do not support its conclusions. She contends that "many of the courts [sic] findings are erroneous" and contests two specific findings: first, that she failed to consistently participate in any service and second, that she failed to complete

evaluations as recommended. Appellant's Brief at 12. She also asserts that all reasonable efforts were not made before resorting to the involuntary termination of her parental rights and that important referrals for serious issues, such as mental health concerns, were ignored. She further contends "[i]t is important to note here that Mental Illness was a concern in this case" and that the trial court "holds it against Mother for not participating in services when Mother cannot participate in services that referrals have not been made and for which there was a clear concern of Mental Illness," and in support points to FCM Wade's testimony as to why Mother was not referred for a psychosocial evaluation. *Id.* at 12-13.

[21] In response, DCS argues that Mother failed to consistently submit to random drug screens and failed to attend visits with the Children, "stopped participating in Character Restoration after six sessions and refused to participate any further," refused to participate in individual therapy, and failed to participate in homebased services at Promising Futures, Inc. Appellee's Brief at 23 (citing DCS Exhibits 6, 9, 11, 12, 13, 17, 19, and 27). DCS contends that it referred Mother to individual therapy, which could have addressed issues of mental illness, but she refused to participate in the therapy like she had with many of the other services which were offered. In support of the trial court's finding that Mother completed a psychological evaluation and failed to complete other evaluations as recommended, DCS asserts that the psychological evaluation Mother completed in 2014 was still relevant and that it took Mother months to complete the substance abuse assessment at Wabash Valley Alliance, which she

did on May 3, 2016. DCS additionally points to several findings of fact in the trial court's order to support the conclusion that a reasonable probability existed that Mother would not remedy the conditions which resulted in the removal of the Children, draws attention to Mother's lack of visitation with the Children since December of 2016, and contends that Mother failed to truly benefit from the little services that she had participated in.

[22] To the extent Mother does not challenge the court's findings, any unchallenged facts stand as proven. *See In re Involuntary Termination of Parent-Child Relationship of B.R.*, 875 N.E.2d 369, 373 (Ind. Ct. App. 2007) (failure to challenge findings by the trial court resulted in waiver of the argument that the findings were clearly erroneous), *trans. denied*; *McMaster v. McMaster*, 681 N.E.2d 744, 747 (Ind. Ct. App. 1997) (when the father failed to challenge specific findings, this Court accepted them as true).

[23] The record reveals that the February 3, 2016 parental participation decree ordered Mother to not consume or possess alcohol, any legend drug, or controlled substance without a prescription and to participate in intensive case management and in a substance abuse assessment. Mother was found in contempt for failure to comply with the parental participation order for having consumed alcohol as evidenced by positive drug screens collected on January 20, 2016, January 28, 2016, February 4, 2016, and February 12, 2016; tested positive for substances, including marijuana and alcohol, in January, February, March, April, and June of 2016; and was charged with various drug offenses in 2017. We also observe that, to the extent that Mother did engage in any

services, she was hostile and aggressive with service providers and that several service providers discharged her. Regarding a psychological evaluation, FCM Wade testified Mother needed to participate in a clinical evaluation, the "testimony or in the report written on the psych evaluation is, '[Mother] didn't want to participate in that,'" and that Mother's "compliance would not be there." Transcript Volume 2 at 65. Considering the record, together with Mother's unresolved substance abuse issues and the unchallenged findings of the trial court, we conclude that clear and convincing evidence supports the court's determination that there is a reasonable probability that the conditions leading to the Children's removal will not be remedied. *See In re A.S.*, 17 N.E.3d 994, 1005 (Ind. Ct. App. 2014) (holding that there was a reasonable probability that the conditions that led to the children's removal, including substance abuse, would not be remedied and noting that "while [the mother] remedied two of the conditions that led to the children's removal, there was no evidence that she would remedy her substance abuse").

B. *Best Interests*

[24] We next consider Mother's assertion that DCS failed to demonstrate that termination of her parental rights was in the Children's best interests. In determining what is in the best interests of a child, the trial court is required to look beyond the factors identified by DCS and to the totality of the evidence. *McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). In so doing, the court must subordinate the interests of the parent to those of the children. *Id.* Children have a paramount need for permanency

which the Indiana Supreme Court has called a central consideration in determining the child's best interests, and the Court has stated that children cannot wait indefinitely for their parents to work toward preservation or reunification and courts need not wait until the child is irreversibly harmed such that the child's physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *In re E.M.*, 4 N.E.3d at 647-648. Recommendations of the case manager and court-appointed advocate, in addition to evidence that the conditions resulting in removal will not be remedied, are sufficient to show by clear and convincing evidence that termination is in the child's best interests. *In re A.S.*, 17 N.E.3d 994, 1005 (Ind. Ct. App. 2014), *trans. denied*.

[25] FCM Wade testified that it was in the Children's best interest that Mother's rights be terminated and that they be adopted by their current placements. CASA Lindblom testified as to her belief that parental rights should be terminated and as to her support of DCS's plan for adoption. Based on this testimony, as well as the totality of the evidence contained in the record and as set forth in the court's termination order, we conclude that the court's determination that termination is in the best interests of the Children is supported by clear and convincing evidence. *See In re A.I.*, 825 N.E.2d 798, 811 (Ind. Ct. App. 2005) (concluding that testimony of child advocate and family case manager, coupled with evidence that conditions resulting in continued placement outside home will not be remedied, is sufficient to prove by clear and convincing evidence termination is in child's best interests), *trans. denied*.

## *Conclusion*

[26] We conclude that the trial court did not err in terminating the parental rights of Mother.

[27] Affirmed.

Bailey, J., and Crone, J., concur.